**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JAMES PETERSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 13 C 3133** |
| **v.** ) | |
| ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MICHAEL T. MASON, United States Magistrate Judge:

Claimant James Peterson ("Peterson" or "claimant") brings this motion for summary judgment [17] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner").  The Commissioner denied Peterson's claim for disability insurance benefits under the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i) and 423(d).  The Commissioner has filed a cross-motion for summary judgment [22], asking that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g).  For the reasons set forth below, claimant's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied.

**I.      BACKGROUND**

**A.      Procedural History**

Peterson filed for disability insurance benefits in July of 2010.  (R. 164-65.) Peterson alleges that he has been disabled since December 2, 2009 due to right ankle

degenerative joint disease/osteoarthritis, left knee reconstruction, bicipital tendonitis, rotator cuff tear, hypertension, chronic low back pain, and numbness in hands.  (R. 87.)  Peterson's application was denied initially on October 27, 2010, and again on reconsideration on December 30, 2010.  (R. 82-87, 92-96.)  A hearing was held before ALJ Patricia Supergan on July 6, 2011.  (R. 38-73.)  On October 13, 2011, the ALJ issued a decision denying Peterson's request for benefits.  (R. 23-37.)  Then, on December 13, 2011, Peterson filed a request for review by the Appeals Council.  (R. 15.)  On February 27, 2013, the Appeals Council denied Peterson's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. 1-7.)  Peterson subsequently filed this action in the District Court.  The parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c) [11].

### B.    Medical History

#### 1.    Treating Physicians

Peterson's medical conditions relevant to the instant appeal began with a diagnosis of de Quervain's disease (an inflammation of tendons in the thumb that extends to the wrist) in his right wrist in 2005.  (R. 270.)  He underwent a cortisone injection in November 2006, which only helped temporarily.  (*Id.*)  On April 3, 2007, Dr. Jerry Chow, noted that Peterson had a mild positive Finkelstein Test in his right wrist and would consider surgical release if the pain increased.  (R. 266.)

On October 3, 2007, Peterson underwent surgery to treat the de Quervain's disease in his right wrist.  (R. 271-72.)  During the pre-surgery evaluation, Dr. Chow noted that Peterson's head and neck examination were normal, as well as his lungs and heart.  (R. 270.)  An x-ray of the right wrist showed a VISI-deformity, unrelated to the de

Quervain's disease.  (*Id.*)  Two weeks after the surgery, on October 16, 2007, Peterson reported to Dr. Chow that he was beginning to feel better, with the exception of some stiffness in his right wrist.  (R. 267.)  Dr. Chow removed Peterson's sutures and directed him to undergo physical therapy.  (*Id.*)

On April 16, 2008, Peterson began receiving treatment from Dr. Alexander Michalow, an orthopedic physician, after complaining of right shoulder and upper arm pain, and pain in his right ankle.  (R. 287.)  Dr. Michalow noted that Peterson had very good rotator cuff and elbow flexion strength, "mild local ecchymosis," little pain, and minimal tenderness.  (*Id.*)  X-rays of the shoulder were unremarkable.  (*Id.*)  Dr. Michalow concluded that Peterson suffered from a bicipital tendon rupture at the right shoulder.  (*Id.*)  Dr. Michalow decided that, because the rupture was in the non-dominant arm and resulted in no loss of function or strength, the problem did not warrant surgery or further treatment beyond conservative care at that time.  (R. 288.)

During the same appointment, Peterson told Dr. Michalow that he believed the pain in his right ankle stemmed from a fracture caused by a high school injury that was treated improperly.  (R. 287.)  Dr. Michalow determined that Peterson's right ankle had some reduction in range of motion, and "mild [but] chronic hypertrophic synovitic changes."  (*Id.*)  After reviewing an x-ray, Dr. Michalow concluded that Peterson suffered from moderately severe degenerative joint disease in the right ankle.  (*Id.*)  He advised Peterson to continue wearing appropriate footwear and taking over the counter medication, and to consider a fusion if the pain increased.  (R. 288.)

On May 29, 2009, Peterson sustained an injury to his left shoulder while working

as an electrician.  (R. 289.)  Dr. Michalow examined Peterson on June 8, 2009, and observed a full range of motion, very good rotator cuff strength, and minimal pain.  (*Id.*) Peterson also told Dr. Michalow that pain from his shoulder injury had subsided and required little medication.  (*Id.*)  Dr. Michalow ultimately concluded that Peterson suffered a left bicipital tendon rupture and he advised Peterson to consider surgical remedies in order to maximize strength.  (R. 289-90.)  Peterson indicated that, because the tendon tear in his right shoulder had been doing well without surgery, he did not want surgery at that time.  (R. 289-90.)

Peterson returned for a follow up appointment with Dr. Michalow on July 13, 2009, reporting increased weakness upon reaching; he described his pain as "not that bad" and reported that he was "getting by ok" at work.  (R. 291.)  Dr. Michalow opined that the weakness suggested a complete left rotator cuff tear and directed Peterson to undergo an MRI.  (R. 291.)  Peterson next visited Dr. Michalow on August 12, 2009.  (R. 292.)  At that time, a physical examination and the results of Peterson's MRI led Dr. Michalow to conclude that Peterson had indeed suffered a complete tear of his left rotator cuff.  (*Id.*)  He advised Peterson to schedule reparative surgery.  (R. 293.)

On December 3, 2009, Dr. Michalow performed surgery on Peterson's left shoulder.  (R. 323-24.)  The postoperative diagnosis indicated that Peterson had a left shoulder rotator cuff tear with degenerative partial bicep tear and a degenerative labrum tear.  (R. 323.)

Dr. Michalow followed up on Peterson's surgery with examinations on December 7 and December 14, 2009.  (R. 295.)  Peterson described his pain as "not bad," and Dr. Michalow noted that the shoulder was healing cleanly and on schedule.  (R. 295-96.)

4

By his January 11, 2010 follow-up examination, Peterson had regained a 90-degree range of motion in his left shoulder.  (R. 297.)  Dr. Michalow  instructed Peterson on stretching and told him he could perform only "desk light duty" if it was available.  (R. 297, 353.)  On February 8, 2010, Dr. Michalow concluded that Peterson's range of motion of the shoulder had returned to normal and, though his rotator cuff strength remained weak, it had greatly improved since Peterson's January 11, 2010 examination.  (R. 298.)  He referred Peterson for physical therapy and advised him to remain off work unless light desk work became available.  (*Id.*)

Peterson returned for follow-up visits on March 8, April 5, May 3, and June 2 of 2010.  (R. 299-303.)  Dr. Michalow continued to find Peterson's range of motion in the shoulder to be fully restored and noted continued improvement with the help of physical therapy, despite some weakness in his left rotator cuff.  (*Id.*)  Dr. Michalow continued to advise only light work duties if available, with no overhead reaching and a limited lifting restriction.  (*Id.*)  The physical therapy notes show Peterson was making progress, though at times he demonstrated, pain, diminished strength, and fatigue.  (R. 325-43.)

At an appointment on June 14, 2010, Peterson complained of pain in his right ankle, left knee, and lower back.  (R. 305.)  Upon physical examination, Dr. Michalow observed swelling and reduced range of motion in the right ankle, tenderness in the lumbosacral spine, with pain radiating to the right leg, and a positive straight leg test on the right.  (*Id.*)  He observed good range of motion in the hips, but noted left thigh numbness consistent with meralgia paresthica.  (*Id.*)  Ultimately, Dr. Michalow concluded that Peterson suffered from osteoarthritis of the vertebral column, post-traumatic osteoarthritis of the ankle and foot, meralgia paresthetica, and sciatica.  (*Id.*)

Dr. Michalow recommended braces and ice for the ankle pain, and a fusion as a last resort. (R. 306.) For the leg numbness, he provided cortisone injections. (*Id.*) Dr. Michalow also ordered an MRI. (*Id.*)

On June 21, 2010, Peterson returned to review the results of the MRI, which showed a herniated disc at L5-S1, a smaller bulge at L4-5, and lesser degenerative changes elsewhere in the spine. (R. 307, 318.) At that time, Peterson explained that his right ankle pain was the major limiting factor for physical activity while on his feet. (*Id.*) Dr. Michalow determined that Peterson's right ankle might require surgery in the future, but that his spinal changes were "not bad enough to consider surgery at this point." (R. 307-08.) Dr. Michalow also advised Peterson to "consider job change for less physical activity." (R. 308.) On July 7, 2010, Dr. Michalow concluded that Peterson had recovered full range of motion in his left shoulder and exhibited "very good" strength in his rotator cuff. (R. 309.)

Peterson underwent an EMG of his hands on July 8, 2010 with Dr. Ashraf Hasan. (R. 320-22.) The EMG showed "[electrodiagnositc evidence of a mild sided carpal tunnel syndrome . . . demyelinating in nature" and "electrodiagnostic evidence of a moderate left sided carpal tunnel syndrome . . . demyelinating in nature." (*Id.*) One week later, on July 14, 2010, Peterson complained to Dr. Michalow of bilateral hand pain. (R. 311.) He also continued to complain of ankle, back, and neck pain, and left thigh numbness. (*Id.*) He explained that the injections only relieved his pain for a couple of days. (*Id.*) Dr. Michalow agreed that Peterson suffered from carpal tunnel syndrome in both hands, but more severely in his left dominant hand. (R. 312.) Dr. Michalow explained the need for surgery in the left hand due to progressed nerve

slowing.  (*Id.*)  Dr. Michalow gave Peterson another cortisone injection in his left hip and advised him to continue his home exercise program.  (*Id.*)  At that time, Peterson had been released to work after a functional capacity evaluation, but there was apparently no work available at the released level.  (*Id.*)

A few weeks later, Dr. Michalow noted that Peterson was not able to do heavy "standing/walking" type work due to his progressive osteoarthritis and recommended that he consider vocational rehabilitation in the future to do "light duty type work."  (R. 314.)  Dr. Michalow again recommended surgery for Peterson's left carpal tunnel syndrome, which Peterson was to call to schedule.  (*Id.*)

Dr. Michalow's most recent medical report, dated August 9, 2010, listed Peterson's active problems as including: "ankle joint pain, bicipital tendonitis, complete tear of the rotator cuff tendon, foreign body in the eye, herniated disc, localized osteoarthritis of the ankle [and] foot, localized primary osteoarthritis of the ankle, localized primary osteoarthritis of the vertebral column, meralgia paresthetica, rotator cuff tendonitis, rupture of the bicipital tendon, sciatica, superior glenoid labrum lesion."  (R. 315.)  As far as the shoulder was concerned, Dr. Michalow stated that Peterson could return to work, with some limitations, but acknowledged that Peterson remained off work due to his other joint problems.  (R. 315-16.)

Dr. Hasan examined Peterson twice in August 2010.  (R. 374-77.)  Peterson continued to complain of low back pain and left extremity pain, worsened when walking or standing.  (R. 376.)  Dr. Hasan reviewed the June 2010 MRI of the lumbar spine.  (*Id.*)  Upon examination, Dr. Hasan noted that Peterson was able to "get on and off the exam table without assistance" as well as "heel walk and toe walk," though he noted an

antalgic gait.  (R. 374, 377.)  Tenderness was noted across the lower lumbar paraspinal muscles, as was pain upon certain motions.  (*Id*.)  Dr. Hasan assessed "chronic lower back pain, degenerative disc disease of the lumbar spine, facet arthopathy of the lumbar spine, and sciatica."  (R. 377.)  Dr. Hasan administered steroid injections, and recommended physical therapy and that he continue to take Norco.  (*Id*.)  Peterson did not want to evaluate surgical options.  (R. 374.)

Peterson returned to see Dr. Hasan on October 18, 2010.  (R. 518.)  He reported no relief from the steroid injections.  (*Id*.)  He had started physical therapy, but was unsure whether it was helping.  (*Id*.)  He reported taking Hydrocodone three times per day, as well as Naprosyn with mild relief of his symptoms.  (*Id*.)  Additional steroid injections were administered.  (R. 523-24.)  At a follow up appointment on October 28, 2010, he reported only mild relief from the injections and "some relief" from physical therapy.  (R. 515.)  He described his back pain as constant in nature, and explained that his leg pain worsened after standing longer than twenty minutes.  (*Id*.)  The physical examination again revealed a slightly antalgic gait, some tenderness in the spine, and pain upon maneuvering.  (R. 515-16.)  Injections were again administered and Dr. Hasan continued to recommend that Peterson remain off work during this time period.  (R. 517, 521-22.)  No significant relief was reported at the November 17, 2010 appointment.  (R. 513.)

By December 1, 2010, Peterson had finished physical therapy.  (R. 510.)  X-rays taken that day showed degenerative spondylosis with no acute bony abnormality.  (*Id*.)  Range of motion of the cervical spine was limited for flexion and lateral rotation bilaterally.  (*Id*.)  At this time, Dr. Hasan had a lengthy conversation with Peterson

regarding possible spinal cord stimulation.  (*Id.*)  He ordered an MRI and recommended that Peterson remain off work.  (*Id.*)

Peterson visited neurosurgeon Dr. Charles Harvey on January 27, 2011.[1]  (R. 553-54.)  The physical examination revealed normal results other than a diminished pinwheel sensation in the left anterior thigh.  (R. 553.)  Dr. Harvey reported that a January 17, 2011 lumbar CAT scan showed moderate spinal stenosis at the L4-5 level with broad based disc bulging, and mild broad based disc bulging at the L5-S1 level with degenerative disc disease at the L5-S1 level.  (*Id.*)  A myelogram showed a mild extradural mass effect at the L1-L2 level and a prominent extradural mass effect anteriorly at the L4-L5 level.  (*Id.*)  A cervical MRI from December 2010 revealed very minimal posterior disc bulge at C3-4 and minimal generalized disc annular bulging at the C6-7 level.  (R. 554.)  Results of a January 20, 2011 EMG were normal.  (R. 553.)  Based on these results and his examination, Dr. Harvey determined that surgery, in particular a posterior lumbar laminectomy and foraminotomy, would be the best option for Peterson.  (R. 554.)

On January 31, 2011, Dr. Hasan completed a questionnaire on residual functional capacity.  (R. 544-46.)  Dr. Hasan explained that he had first treated Peterson in August of 2010 for his low back pain, left lower extremity pain, and burning sensation.  (R. 544.)  When asked to list all clinical findings and laboratory results regarding Peterson's condition, he cited to a January 2011 EMG, a December 15, 2010 MRI, and

---

[1] Dr. Harvey's records were not presented to the ALJ prior to the hearing or her decision.  We include a description here because Peterson has raised an issue regarding the Appeals Council's treatment of those records.

9

the June 15, 2010 MRI.  (*Id.*)  According to Dr. Hasan, Peterson can walk one city block before stopping, stand for twenty to thirty minutes, sit for one hour, alternate sitting or standing for thirty minutes, and must lie down during the day to take pressure off his neck and back.  (R. 545.)  He concluded that Peterson can lift twenty-one to fifty pounds and can carry eleven to twenty pounds, but that pushing and pulling causes pain in the upper and lower back.  (*Id.*)  He further opined that Peterson would have difficulty bending, squatting, kneeling, and turning parts of his body.  (R.  546.)  In Dr. Hasan's opinion, Peterson's pain was "constant in nature" and "consistent with MRI" results. (*Id.*)

On May 13, 2011, Dr. Mukund Komanduri, an orthopedic physician, performed an independent medical evaluation of disability as part of Peterson's workers compensation claim.  (R. 547-50.)  In addition to examining Peterson, Dr. Komanduri reviewed various records from Peterson's treating physicians.  (R. 547.)  At the appointment, Peterson claimed he could sit continuously for one hour, walk one block without stopping, and carry twenty pounds without difficulty.  (R. 548.)

Upon physical examination, Dr. Komanduri observed some limited cervical range of motion, mild impingement upon shoulder motion, pain upon certain lumbar motion, restricted range of motion of the right ankle, and "obvious right wrist de Quervain's tenosynovitis."  (*Id.*)  Dr. Komanduri confirmed that imaging records showed severe osteoarthritis of the right ankle, a left rotator cuff tear, a thoracic disc herniation, and multi-level degenerative disc disease of the lumbar spine.  (*Id.*)

Dr. Komanduri concluded that Peterson suffered from "multiple correctable musculoskeletal injuries" that resulted in Peterson being "functionally capable of sitting

10

for one hour at a time." (R. 549.)  With appropriate restrictions, he believed that
Peterson could work at a sedentary position, although with limited functional capacity
due to his limitations in his ability to walk and his hand limitations.  (*Id.*)  He also noted
that Peterson would require substantial vocational rehabilitation in light of the fact that
he had only ever worked as an electrician.  (*Id.*)  Further, he concluded that Peterson's
severe pain and "need for constant narcotics" make him nonfunctional in a job
environment on a daily basis.  (*Id.*)  Ultimately, Dr. Komanduri concluded that Peterson
could only work part-time (four hours) in a sedentary position and was thus unable to
return to work as a union electrician and was temporarily qualified for total disability
from the union.  (*Id.*)  However, Dr. Komanduri opined that, once Peterson's back and
hand problems were surgically addressed, he would be able to work in a sedentary to
light duty position.  (*Id.*)  He also questioned why Peterson was delaying surgical
intervention.  (R.  550.)

As of June 8, 2011, Dr. Hasan continued to recommend that Peterson stay off
work.  (R. 551.)

### 2. Agency Consultants

On October 25, 2010, Dr. Francis Vincent conducted a physical residual
functional capacity ("RFC") assessment.  (R. 497-504.)  Dr. Vincent determined that
Peterson could occasionally lift up to twenty pounds, frequently lift up to ten pounds;
could stand for at least two hours and sit for six hours in an eight hour day; and had no
limits on his ability to push or pull.  (R. 498.)  Dr. Vincent also determined that, as a
result of his lower back and knee complaints, Peterson could occasionally climb ramps
or stairs, but never ladders, ropes, or scaffolds; could frequently balance and crouch;

and could occasionally stoop, kneel, and crawl.  (R. 499.)  Dr. Vincent found no

limitations on Peterson's hand, finger, or reaching manipulations, nor any visual or

communicative limitations.  (R. 500-501.)  He did conclude that Peterson should avoid

hazardous machinery due to his diminished physical agility.  (R. 501.)

In the narrative portion of his report, Dr. Vincent reviewed Peterson's activities of

daily living reports, as well as the August 2010 medical records of Dr. Hasan.  (R. 504.)

Dr. Vincent concluded that Peterson's claims regarding the degree of his pain deserved

only partial credibility, as the "reported degree and frequency of pains are more than

objective evidence can support."  (R. 504.)  Dr. Barry Free affirmed Dr. Vincent's

findings on December 28, 2010.  (R. 540-42.)

### C.    Peterson's Testimony

Peterson appeared with counsel at the hearing before the ALJ and testified as

follows.  Peterson was born on January 9, 1964, making him 47 years old at the time of

the hearing.  (R. 42-43.)  Peterson completed high school and was certified as an

industrial electronics technician in 1983 after attending a trade school.  (R. 43, 54.)

Peterson lives with his wife in a two-story house, though his bedroom is on the first

floor.  (R. 54.)

Peterson worked as an electrician for 27 years, last working on December 3,

2009 in Kankakee, Illinois.  (R. 43-45.)  In his job as an electrician, Peterson supervised

other employees, ran conduit, operated a jackhammer and control panels, and

performed other activities in the electrical field.  (R. 44.)  He was on his feet most of the

day, and at times lifted up to 100 pounds and operated heavy machinery for up to eight

hours.  (R. 44-45.)

12

Next, Peterson testified about his various medical problems.  He explained that his "worst problem" was his upper and lower back.  (R. 45.)  In his lower back, he has two herniated discs and two pinched nerves.  (*Id.*)  If he sits too long, he feels a "needly" or sharp pain down his right sciatic nerve.  (*Id.*)  Additionally, Peterson describes a "numbing, burning . . . bleeding feeling" if he stands for more than twenty to thirty minutes that can only be relieved by sitting or laying down.  (R. 45-46.)  Peterson further testified that his upper back, or neck, has "a couple bulged disks" currently being treated by Dr. Hasan.  (R. 46.)  He explained that it feels like his head is too heavy for his neck, and he often has to relieve the pain by lying down.  (*Id.*)  Reading and looking down exacerbate his neck problem.  (R. 47.)  Peterson also has difficulty sleeping more than three or four hours a night due to the pressure in his neck.  (R. 46-47.)

In May of 2009, Peterson tore his left rotator cuff and his left bicep muscle while he was pulling wire.  (R. 45.)  On a separate occasion, he tore his right bicep muscle.  (R. 49.)  These injuries cause cramps when he does any lifting or pulling.  (*Id.*)  Peterson also testified that his right ankle was fractured and improperly treated in high school.  (*Id.*)  As of 2002, he suffered from "bone-on-bone osteoarthritis" in his right ankle, which causes a nine out of ten "needly, sharp pain" when he walks or stands.  (R. 49-50.)  Peterson further testified that he injured the bottom of his foot six years ago after jumping from a scaffold onto rocks.  (R. 47.)  This injury creates a feeling of "walking on marbles" and causes his toes to curl up if he walks for more than twenty minutes.  (R. 48.)

Peterson testified that he also suffers from moderate to severe carpal tunnel syndrome in his left hand (he is left-handed) and mild carpal tunnel syndrome in his

13

right hand.  (R. 50-51.)  This causes his hands to feel "50 times as big as they are" and like they are "going to explode."  (R. 50.)  As a result, Peterson has difficulty grasping or holding objects and writing.  (R. 50-51, 53.)  He underwent surgery in his right wrist, but still suffers from sharp, needly pain.  (R. 51.)

Next, Peterson described a typical day.  Peterson testified that he wakes early, stretches for five to ten minutes, eats breakfast, and performs household chores, but must take four or five breaks during the day to lie down, mostly due to the pressure and pain in his upper back and neck.  (R. 51-52.)  He tries to stretch three or four times a day.  (R. 51.)  Peterson takes pain medication every day, but he tries not to take too much.  (R.53.)  He does not suffer any side effects from his medication.  (*Id.*)

Peterson stated that he drives a couple times a day to grab a bite to eat or visit his parents.  (R. 55.)  He drinks socially, does not smoke regularly, and does not use street drugs.  (R. 55-56.)  Peterson has a cell phone, but does not use text messaging.  (R. 56.)  He recently bought a computer, which he uses to check stocks and sports news.  (*Id.*)  Peterson stated that he watches television for four to five hours a day while either sitting or lying down.  (R. 56-57.)  Peterson's wife does the grocery shopping.  (R. 54.)  Lastly, Peterson testified that after thirteen weeks, he had recently been removed from temporary disability by the union.  (R. 57-58.)

### D.  Vocational Expert's Testimony

Vocational Expert ("VE") Matthew Lampley also testified at the July 6, 2011 hearing.  The VE first categorized Peterson's past work experience as an electrician at a medium exertion level according to the Dictionary of Occupational Titles ("DOT"), but at a "very heavy level" as performed by Peterson.  (R. 60.)

14

The ALJ then asked the VE to consider a hypothetical individual of Peterson's age, education, and work experience who could perform light work as defined in the regulations; could occasionally climb ramps and stairs, but never ladders, ropes or scaffolds; could frequently balance and stoop; occasionally kneel, crouch and crawl, but must avoid concentrated exposure to hazards such as moving machinery, and unprotected heights. (R. 61.) The ALJ asked the VE if this hypothetical individual could perform Peterson's past relevant work. (*Id.*) The VE testified that the individual could not perform Peterson's past relevant work, but would be capable of performing unskilled light level positions, such as host (3,400 jobs available regionally), usher (4,400 jobs), and bench assembler (3,700 jobs). (R. 62.)

Next, the ALJ presented the VE with a second hypothetical individual who could perform light work as defined in the regulations; could occasionally climb ramps and stairs, but never ladders, ropes or scaffolds; could occasionally balance and stoop, but never kneel, crouch or crawl; could reach in all directions except overhead with the upper extremities; could frequently perform gross and fine manipulations; and must avoid concentrated exposure to hazards, such as moving machinery and unprotected heights. (R. 62-63.) The VE testified that such an individual could perform the usher and host jobs, but not the bench assembler job due to the overhead reaching restriction. (R. 63.) The individual could also work as a school bus monitor. (R. 63-64.) When the ALJ described an individual who could perform a full range of sedentary work, but had no other limitations, the VE explained that he could perform work as a final assembler (2,200 jobs available regionally), charge account clerk (2,300 jobs), and addresser (1,500 jobs). (R. 64.)

The ALJ then described a hypothetical individual who was limited to sedentary work, and subject to the same limitations as provided in the second hypothetical above, including the limitations on overhead reaching and frequent handling.  (R. 64-65.)  The VE testified that, in his opinion, 50% of the previously described sedentary jobs would still be available to such an individual.  (R. 65.)  An additional limitation, in which the individual must alternate between sitting and standing every thirty minutes would limit the available sedentary jobs to a point where he was not able to cite any positions with a reasonable "amount of vocational certainty."  (R. 65-67.)  The VE testified though that light jobs, such as information clerk and office helper would be available, but in more limited numbers due to the overhead reaching limitation.  (R. 67-68.)  He also testifined that, if an individual needed to rest for 25% percent of an eight-hour day, all competitive employment would be precluded.  (R. 68.)

On cross-examination, Peterson's attorney asked the VE to alter the ALJ's hypothetical regarding sedentary individuals to consider an individual who could perform hand or finger manipulations only occasionally.  (R. 70.)  The VE testified that there would be no work available to such an individual.  (*Id.*)

## II.     Legal Analysis

### A.      Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g) (2010); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971)). Our review is deferential, and while we must consider the entire administrative record, we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

While the ALJ "must build an accurate and logical bridge from the evidence to [her] conclusion," she need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B.     Analysis under the Social Security Act

To qualify for disability insurance benefits, a claimant must be disabled under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period not less that twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's

17

impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

Here, the ALJ employed this five-step analysis. At step one, the ALJ found that Peterson "has not engaged in substantial gainful activity since December 2, 2009, the alleged onset date." (R. 28.) At step two, the ALJ found that Peterson suffered from the following severe impairments: "degenerative joint disease of the right ankle, degenerative joint disease of the shoulder, status post rotator cuff surgery and degenerative disc disease." (*Id.*) The ALJ did not include Peterson's hand or wrist impairments in her consideration at step two.

Next, at step three, the ALJ found that Peterson does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. (R. 28-29.) The ALJ specifically pointed out that he did not satisfy the criteria for Listing 1.02 (major dysfunction of a joint) or Listing 1.04 (disorders of the spine). (R. 29.)

The ALJ went on to examine Peterson's residual functional capacity ("RFC"), concluding that he maintains the ability to perform light work as defined in 20 C.F.R 404.1567(b) except that he can occasionally climb ramps and stairs, but never ladders,

18

ropes or scaffolds; occasionally balance and stoop; never kneel, crouch and crawl; can reach in all directions except overhead; can frequently handle, finger, and feel with both upper extremities; and must avoid concentrated exposure to vibration and hazards such as moving machinery or unprotected heights.  (R. 29-32.)

Given this RFC, at step four, the ALJ concluded that Peterson would be unable to perform his past relevant work as an electrician, either as described in the DOT (medium), or as performed by him (heavy).

At step five the ALJ concluded that, based on the information provided in the vocational expert's testimony, and based on Peterson's age, education, work experience, and RFC, he could make a "successful adjustment to other work that exists in significant numbers in the national economy," such as host, usher, and school bus monitor.  (R. 32-33.)  Accordingly, the ALJ decided that Peterson has not been under a disability from December 2, 2009, through the date of the decision.  (R. 33.)

Peterson now argues that the ALJ erred by (1) failing to adequately evaluate the medical opinions of record; (2) failing to evaluate his bilateral carpal tunnel syndrome; and (3) failing to consider the impact of his weight on his impairments.  Peterson also argues that the Appeals Council erred by failing to consider new and material evidence provided after the ALJ's decision.  We start with this issue.

### C.    The Appeals Council Correctly Denied Review of Peterson's "New And Material" Evidence.

According to Peterson, the Appeals Council failed to properly consider "new and material" evidence, namely the January 27, 2011 records from Dr. Harvey showing

lumbosacral neuritis and lumbar spinal stenosis.  We disagree.[2]

To necessitate remand, evidence must be "new" and "material," and there must be good cause "for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g) (2012).  Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding."  *Simila v. Astrue*, 573 F.3d 503, (7th Cir. 2009) (*quoting Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997)).  Evidence is "material" if there is a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered.  *Perkins*, 107 F.3d at 1296.

Here, because the additional evidence involved a medical consultation with Dr. Harvey six months prior to Peterson's hearing before the ALJ, it is certainly not "new." And Peterson has offered no reason for the delay in producing Dr. Harvey's records. Nor is this evidence material because as early as June 22, 2010, Dr. Michalow made similar findings regarding the lumbar spine following an MRI.  (R. 374.)  As a result, we find no reversible error in the Appeals Council's decision to decline review of the additional evidence.

**D.  The ALJ Did not Err in her Treatment of Peterson's Obesity.**

Peterson also argues that the ALJ committed reversible error by failing to properly consider his obesity.  Again, we disagree.

Peterson correctly states that the ALJ must consider the "combined effects of

---

[2] The record contains two other exhibits, 17F and 18F, that were purportedly submitted to the Appeals Council.  Those records appear to have been inadvertently submitted as they clearly relate to a different individual.  (*See* R. 556-60.)

obesity with other impairments," and consider his disabilities "in the aggregate."  Social

Security Ruling ("SSR") 02-1p, 2000 WL 628049, at *1 (2002); *Martinez v. Astrue*, 630

F.3d 693, 698-99 (7th Cir. 2011).   However, Peterson fails to point to any evidence in

the record indicating how his obesity further limits his ability to work.  *See Prochaska v.*

*Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (finding harmless error on part of ALJ

where the claimant failed to "specify how [her] obesity further impaired [her] ability to

work.") (*quoting Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).  As a result,

we find no reversible error in the ALJ's failure to address Peterson's obesity.

 **E. The ALJ Failed To Adequately Address the Treating Physicians'**
   **Opinions.**

 Next, Peterson argues that the ALJ failed to properly evaluate the opinions of

Peterson's treating physicians.  On this point, we must agree.

 As a general matter, the ALJ will give the opinion of a treating physician

controlling weight because treating physicians are "most able to provide a detailed,

longitudinal picture" of the claimant's medical condition.  20 C.F.R. § 404.1527(c)(2).

However, a treating physician's opinion concerning the nature and severity of a

claimant's condition receives controlling weight only when it is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is consistent with

substantial evidence in the record.  *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir.

2008).  "If an ALJ does not give a treating physician's opinion controlling weight, the

regulations require the ALJ to consider the length, nature, and extent of the treatment

relationship, frequency of examination, the physician's specialty, the types of tests

performed, and the consistency and supportability of the physician's opinion" to

determine what amount of weight to afford the opinion.  *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (*citing* 20 C.F.R. § 404.1527(c)(2)).

Here, the ALJ's treatment of the opinions of Peterson's physicians leaves us unable to trace the path of her reasoning.  First, with respect to Dr. Michalow, the ALJ found support in his repeated assertions that Peterson could perform "light duty work." (R. 31.)  However, there is no indication that Dr. Michalow's definition of that phrase is in line with the regulatory definition, and, in fact, Dr. Micalow opined that Peterson could not perform "any standing/walking type of work."  (R. 380.)  Such a limitation is not in line with the regulatory definition of light duty positions, which can require "a good deal of walking or standing."  20 CFR § 404.1567(b).

The ALJ also misrepresented portions of Dr. Michalow's evaluations when she stated: "[b]y August 2010, the claimant was in 'no pain' and had minimal aches. He was not taking any pain medication.  He had been off work for 'other reasons.'"  (R. 30.)  The complete record from August of 2010 shows that Peterson was prescribed four different medications, including Hydrocodone for pain up to three times a day, and lists a number of "active problems," including ankle joint pain.  (R. 315.)  More importantly, Dr. Michalow elaborated that the "other reason" for Peterson remaining off work was his pain in "other joints."  (*Id.*)  In this regard, the ALJ improperly cherry-picked certain portions of Dr. Michalow's treatment records to support her conclusion.  *See Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009) (The ALJ "may not selectively consider medical reports, especially those of treating physicians..."); *see also, Goble v. Astrue*, 385 Fed. App'x 588, 593 (7th Cir. 2010) (The ALJ may not "cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.").

As for Dr. Hasan, although the ALJ properly noted that Dr. Hasan's June 8, 2011 work status report was conclusory, she disregarded Dr. Hasan's other, non-conclusory, statements regarding Peterson's condition or the objective medical evidence on which Dr. Hasan based his conclusions. Most notably, in Dr. Hasan's responses to a questionnaire on Peterson's RFC he stated that, based on X-ray, EMG, and MRI exams, and "[four] pain procedures" since August 2010, Peterson's pain was "constant in nature" and "consistent with MRI" results. (R. 544-46.) Thus, the ALJ's statement that the treating physicians' opinions, including Dr. Hasan's, were based solely on Peterson's subjective complaints and "minimal objective diagnostic findings" is without merit.

With respect to Dr. Komanduri's evaluation, the ALJ erroneously states, "the only definitive statement [in Dr. Komanduri's report] is that the claimant cannot return to his former occupation." (R. 31.) In fact, Dr. Komanduri made several definitive statements, including: "[f]or [Peterson] to function in a sedentary position he would require substantial vocational rehabilitation." (R. 549.) The ALJ also leaves unaddressed Dr. Komanduri's statement that "the factors that play the greatest role [in Peterson's medical limitations] involve the use of chronic narcotics." (*Id.*) This led Dr. Komanduri to conclude, "in reviewing the extent of his narcotic use and severity of his pain scales, it is my belief that he could work part-time in a sedentary position" at least until further treatment was acquired. (*Id.*)

Further, the ALJ discredited Dr. Komanduri's opinion because it "appears to be based upon the claimant's subjective complaints," includes "inherent inconsistences," and lacks a "function by function analysis." (R. 31.) This statement gives us pause for

a number of reasons.  First, as with Dr. Hasan, Dr. Komanduri's opinion was not based solely on subjective complaints, but instead was produced following an examination, and a review of "multiple x-rays . . . a left shoulder MRI . . ." and "MRIs of the cervical, thoracic, and lumbar spine" and other medical records.  (R. 549.)  Second, the ALJ does not elaborate on what inconsistences she is referring to in Dr. Komanduri's evaluation, which prevents us from tracing the path of her reasoning.

Lastly, the third reason for the ALJ's dismissal of Dr. Komanduri's opinion, that is, "a lack of function by function analysis," is based on the mistaken premise that a physician's report must always include such an analysis to have probative value.  (R. 31.)  Contrary to the ALJ's understanding of the issue, "the regulations do not require a treating physician to provide a function-by-function analysis of a claimant's ability to perform daily living or work-related activities, nor is the ALJ required to provide one." *Burnam v. Astrue*, No. 10-5543, 2012 WL 710512, at *15 (N.D. Ill. Mar. 5, 2012)(*citing Knox v. Astrue*, 327 Fed. Appx. 652, 657 (7th Cir. June 19, 2009)).

For all of these reasons, the ALJ failed to provide an adequate evaluation of the opinions of Peterson's treating physicians and remand is required.  As a result, we comment only briefly on Peterson's remaining arguments.  First, given the VE's testimony that a reduction from frequent handling to occasional handling could result in a decreased job base, at least if Peterson was limited to sedentary work, the ALJ should further articulate her assessment of Peterson's well-documented bilateral carpal tunnel syndrome.

Second, the ALJ based her credibility assessment, at least in part, on a failure to pursue surgical treatment.  Peterson argues that this is in violation of SSR 82-59, which

24

requires the ALJ to first inquire about Peterson's reasons for not undergoing surgery. However, SSR 82-59 only comes into play when the ALJ determines that a person is disabled *because* he failed to follow recommended treatment.  That is not the case here.  Nonetheless, because remand is otherwise required, the ALJ should investigate why Peterson chose to forego surgical intervention.  *See Decker v. Colvin,* 2013 WL 5300641, at *12 (N.D. Ill. Sept. 19, 2013) ("Before discrediting [claimant] for rejecting some of the recommended treatment avenues, the ALJ should have elicited [claimant's] reasons for his decisions.").

## III.    Conclusion

For the reasons set forth above, claimant's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.  It is so ordered.

**ENTERED:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:        September 18, 2014**